### UNITED STATES DISTRICT COURT FOR THE
### DISTRICT OF NEW HAMPSHIRE

<u>Tony L. Ellison</u>

     v.                              Civil No. 07-cv-131-SM

<u>New Hampshire Department</u>
<u>of Corrections, et al.</u>[1]

### REPORT AND RECOMMENDATION

Before the Court is pro se[2] plaintiff Tony Ellison's complaint, filed pursuant to 42 U.S.C. § 1983, alleging that the defendants have violated rights guaranteed to him by both federal and state law.  The matter is before me for preliminary review to determine, among other things, whether the complaint has stated any claim upon which relief might be granted.  <u>See</u> United States

---

[1]In addition to the New Hampshire Department of Corrections ("DOC") and DOC Commissioner William Wrenn, Ellison names the following New Hampshire State Prison employees as defendants to this action: H-Building Unit Manager Marquis (first name unknown ("FNU")), Warden Bruce Cattell, Deputy Warden Greg Crompton, Head of Security Mjr. FNU Cunningham, South Unit Manager Lucie Biledeau, South Unit Counselor Robert McGrath, Head of Classification Rick Manseau, Hancock Building Head of Security Lt. FNU Whittan, Sgt. C. Pelletier, Sgt. FNU Lirette, Lt. FNU Boyajian, Lt. FNU Hogan, and Hearings Officers Lt. FNU Guimond, and Sgt. FNU Hickman.

[2]I recognize that Ellison does not believe that he is proceeding pro se, but that he is representing himself as his own sovereign entity, entitled to file complaints on behalf of his sovereignty.  Ellison's complaint has, however, been filed pro se, which means that he is representing himself in this action.

District Court for the District of New Hampshire Local Rule
("LR") 4.3(d)(2)(A).  For the reasons explained herein, I
recommend dismissal of all of the claim alleged except Ellison's
claim that defendants Biledeau, McGrath, Marquis, Whittan,
Cunningham, Cattell, Crompton and Wrenn placed him in danger and
then failed to protect him.  In an Order issued simultaneously
with this Report and Recommendation (the "Simultaneous Order"), I
direct that the endangerment and failure to protect claim be
served against those defendants.

<u>Standard of Review</u>

Under this Court's local rules, when an incarcerated
plaintiff commences an action pro se and in forma pauperis, the
magistrate judge is directed to conduct a preliminary review.  LR
4.3(d)(2).  In conducting the preliminary review, the Court
construes pro se pleadings liberally, however inartfully pleaded.
<u>See</u> <u>Erickson v. Pardus</u>, ___ U.S. ___, 127 S. Ct. 2197, 2200
(2007) (following <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976) and
<u>Haines v. Kerner</u>, 404 U.S. 519, 520–21 (1972) to construe pro se
pleadings liberally in favor of the pro se party).  "The policy
behind affording pro se plaintiffs liberal interpretation is that
if they present sufficient facts, the court may intuit the

correct cause of action, even if it was imperfectly pled." <u>See</u> <u>Castro v. United States</u>, 540 U.S. 375, 381 (2003) (noting that courts may construe pro se pleadings so as to avoid inappropriately stringent rules and unnecessary dismissals of claims); <u>Ahmed v. Rosenblatt</u>, 118 F.3d 886, 890 (1st Cir. 1997) (same).  All of the factual assertions made by a pro se plaintiff and inferences reasonably drawn therefrom must be accepted as true.  <u>See</u> <u>id.</u>  This review ensures that pro se pleadings are given fair and meaningful consideration.

<u>Background</u>

Tony Ellison is serving a lengthy sentence in the New Hampshire State Prison ("NHSP").  Ellison pleaded guilty to three counts of aggravated felonious sexual assault for engaging in sexual acts with his three children, aged 5, 7 and 10.

For the four years prior to the events that gave rise to this complaint, Ellison was housed at the NHSP's South Unit, a medium custody unit where he was generally of good behavior and where he felt safe from physical harm.  In August of 2006, Ellison was scheduled for a hearing before the Classifications Board.  Ellison was told that his attendance at that hearing was not mandatory.  Ellison opted not to attend the hearing.  After

the hearing, defendants Biledeau, the South Unit Manager and South Unit Counselor McGrath issued a Classification report finding that Ellison was a "sexual predator" and had not completed certain programming.

Ellison claims that the categorization of "sexual predator" is misleading and prejudicial to him and to his security status. Ellison states that he has never acted out sexually during his incarceration, and that, although he committed sex offenses against his children, he confessed to the police and entered guilty pleas to spare the children from having to testify at trial. Ellison claims that the label "sexual predator," based solely on the facts of his underlying conviction, unfairly characterizes his security risk at the prison.

Ellison further asserts that at the time the reclassification report was issued, he had, in fact, completed a number of rehabilitative programs, and was not yet eligible to apply for the sexual offender treatment program, as he is not yet close enough to his minimum release date to be eligible for admission to that program.

Ellison claims that the NHSP's rehabilitative programs are voluntary in that inmates are not required to participate in

them.  He asserts, however, that inmates who fail to participate
in certain programming are sanctioned by being moved to a more
dangerous housing unit within the NHSP, or by being transferred
to NCF.  Ellison's reclassification report recommended that he be
transferred either to the NHSP's Hancock Building, or the
Northern New Hampshire Correctional Facility ("NCF") in Berlin,
New Hampshire.  Ellison was transferred to the Hancock building,
to "C-pod," nicknamed the "Gladiator Pod" or the "Little Gangster
Pod" by inmates.  These nicknames derive from C-pod's reputation
for housing young aggressive inmates.  Ellison alleges that
inmates on C-pod are known to target sexual offenders for
harassment and violence.

In addition to a predisposition toward committing violence
against sex offenders in their midst, Ellison alleges that the
conditions and staffing on C-pod enable and promote such
violence.  Ellison alleges that in the Hancock Building, officers
are individually assigned to supervise 288 inmates located on
four separate pods.  The officer assigned to that position is
usually stationed in an observation room, from which the officer
is unable to observe all of the pods at one time, and who can't,
therefore, attend to or prevent violent altercations that occur

on the pods.  Ellison also claims that NHSP officials have failed
to adequately staff Hancock building and C-pod, and have failed
to properly train and supervise the correctional officers
stationed there, and have thus created and maintained an
institution that is unsafe.  Ellison claims that the supervising
officials in charge of Hancock building, defendants Marquis,
Whittan, Cunningham, Cattell, Crompton, and Wrenn, had specific
notice of the danger to sex offenders on C-pod because of a 2005
lawsuit filed by another inmate, Harvey Pratt, complaining of the
violence that sexual offenders suffered there.[3]

In his complaint, Ellison initially alleges that he was
ordered moved to the Hancock Building in retaliation for his
failure to attend the reclassification hearing.[4]  Ellison later

---

[3]See Pratt v. N.H. Dep't of Corrs., D.N.H. No. 05-cv-367-SM
(filed Oct. 17, 2005).

[4]While Ellison did assert a claim based on retaliation
against him for exercising his right not to attend a
classification board hearing, even liberally construing the
allegation, I find that Ellison has not stated any specific facts
which would indicate a causal link between his failure to attend
the hearing and his transfer to the Hancock Building.
Accordingly, I will not consider Ellison's passing reference to
the defendants' alleged retaliation for Ellison's failure to
attend the reclassification hearing as a claim to this action.
If Ellison intended to state a retaliation claim, he must do so
by amending his complaint to include some facts to support his
bald allegation that he was retaliated against.

asserts, however, that he was transferred to the Hancock Building because the classification board members wanted to make a statement to the other inmates in the South Unit that they would be moved to the Hancock Building if they acted out inappropriately.  Later still, Ellison claims that his transfer to Hancock was motivated by the defendants' discriminatory bias against him because he is a sexual offender.

On September 12, 2006, after his transfer to Hancock, Ellison was assaulted by another inmate on C-pod.  Although he tried to defend himself after he was struck by the inmate, he was unable to do so and suffered serious injury, including a three inch long and very deep laceration to his temple that required eighteen stitches to repair.

After Ellison was assaulted, he claims that he went to the pod door to buzz the corrections officer on duty in order to receive medical attention.  No officer responded to Ellison for seven minutes, when the officer on duty opened the pod door in order to let the officer delivering mail onto the pod.  At that point, Ellison was discovered injured and given medical attention.

On September 14, 2006, Ellison was recovering from his head wound in the infirmary.  Marquis and Whittan went to the infirmary to question Ellison about the assault.  Ellison tried to explain to them that he was not safe on C-pod and that he had been inappropriately transferred to that unit.  Marquis told Ellison, however, that the assault was not the result of his housing placement, but was his own fault because he had committed the sexual offenses that made him a target.  Marquis further stated that Ellison should take responsibility for his actions. Ellison then told Marquis that he felt Marquis was acting in an unprofessional manner and that Marquis' comments indicated his condonation of a violent crime that had been motivated by prejudice against Ellison because he is a sexual offender.[5]

On September 15, 2006, Ellison was returned to C-pod from the infirmary.  He was immediately taken to see Marquis, and was again questioned about the September 12 incident by Marquis and Whittan.  Again, Ellison states, Marquis was abrasive and intimidating in his questioning.  Ellison questioned Marquis as

_____

[5]Ellison's complaint contains speculation as to whether or not Marquis may have been an accessory or contributing influence in the attack against him.  Because this claim is based on totally unsupported speculation, I will not consider it as a claim in this action.

to why he had blamed Ellison for the assault.  Marquis and
Whittan directed Ellison to provide a written account of the
incident.  Ellison did the best he could, but had some difficulty
writing the statement because he had a severe headache and
lingering dizziness from his injury.  Despite his injuries,
Ellison says that Marquis screamed at Ellison throughout the
interchange between them, and eventually screamed at Ellison to
get out of Marquis' office.

Within minutes of his return to C-pod, four corrections
officers arrived, ordered Ellison to stand, placed him in
handcuffs, and transported him to the NHSP's Secure Housing Unit
("SHU").  Ellison was not told why he was being moved to the SHU
and he was not given a hearing prior to his move.  Between
September 15, 2006 and September 27, 2006, Ellison was held at
SHU without being told the reason for his transfer.  During that
time, he was denied the property and privileges he had previously
been afforded on C-pod.

On September 27, 2006, Ellison was told that he had been
moved to the SHU  on "Pending Administrative Review" status
("PAR").  The SHU Unit Manager, defendant Moquin, told Ellison
that he should have received a copy of the PAR slip that was

issued on September 15, 2006.  Ellison claims that he did not receive it until September 27, 2006.  On September 29, 2006, disciplinary charges were brought against Ellison.[6]  Ellison claims that the defendants charged him with a disciplinary infraction, and that he was denied an impartial hearings officer, in an effort to cover up the defendants' responsibility for the September 12 assault against him.  Ellison claims that he told Marquis and Whittan that he pushed his assailant away from him in self defense and that this statement was used to improperly find him guilty of a disciplinary action for fighting.  Ellison, upon being found guilty of that disciplinary charge, was ordered to reimburse the NHSP for half of the cost of his medical bills.

Discussion

I.   Section 1983

Section 1983 creates a cause of action against those who, acting under color of state law, violate federal constitutional or statutory law.  See 42 U.S.C. § 1983[7]; City of Okla. City v.

---

[6]Ellison alleges that certain internal procedures were not followed in bringing the disciplinary report.  Because I find that these allegations are immaterial to any cognizable claim in this action, I will not detail the facts Ellison has asserted in support of those allegations.

[7]42 U.S.C. § 1983 provides that:

<u>Tuttle</u>, 471 U.S. 808, 829 (1985); <u>Wilson v. Town of Mendon</u>, 294 F.3d 1, 6 (1st Cir. 2002).  "To state a claim under § 1983, a plaintiff must make two showings: the existence of a federal constitutional or statutory right; and a deprivation of that right by a person acting under color of state law."  <u>Barrios-Velazquez v. Asociacion de Empleados del Estado Libre Asociado</u>, 84 F.3d 489, 491 (1st Cir. 1996).  Ellison's claims allege that state employees at the NHSP violated his federal constitutional rights.  Accordingly, this action arises under § 1983.

II.  <u>Endangerment and Failure to Protect</u>

The safety and security of all prisoners is protected by the constitution.  <u>See</u> <u>DeShaney v. Winnebago County Dep't of Soc. Servs.</u>, 489 U.S. 189, 190 (1989); <u>Youngberg v. Romeo</u>, 457 U.S. 307, 315-16 (1982).  To state a constitutional claim that the defendants endangered or failed to protect him, Ellison must allege that the defendants were aware of and deliberately

---

> Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

11

indifferent to a serious risk to his safety at the hands of other inmates.  See Burrell v. Hampshire County, 307 F.3d 1, 7 (1st Cir. 2002).

Here, Ellison claims that he was transferred into a pod populated by young and aggressive inmates, who were known by the defendants to target sex offenders for harassment and violence. Ellison points to an inmate lawsuit filed almost two years ago, and still being actively litigated, by an inmate who was transferred into C-pod and was severely beaten because he was a sexual offender.  That lawsuit, Pratt v. N.H. Dep't of Corrs., D.N.H. No. 05-367-SM, specifically alleges that the pod in question was called the "Gladiator Pod" and had a reputation for being a dangerous place for sex offenders.  Ellison claims, therefore, that the defendants here were aware of and disregarded the serious risk to his safety that accompanied his transfer to C-pod.  I find that Ellison has stated sufficient facts to state a claim for endangering him, and failing to protect him, against defendants Biledeau, McGrath, Marquis, Whittan, Cunningham, Cattell, Crompton, and Wrenn.  Specifically, Ellison alleges that defendants Biledeau and McGrath placed him in harm's way by recommending his transfer to the Hancock building, and that

defendants Marquis, Whittan, Cunningham, Cattell, Crompton, and
Wrenn, either directly, or indirectly as supervisory prison
officials, failed to protect him from harm once he was on C-pod.[8]
They are, therefore, appropriate defendants to this claim and I
will direct that this complaint be served against them in my
Simultaneous Order.

III. <u>Due Process Violations</u>

    A.   <u>Classification and Housing</u>

Ellison claims that the defendants violated his due process
rights when he was reclassified and transferred to a dangerous
housing unit.  Ellison does not deny that he was afforded a
classification hearing, which he opted not to attend.  Ellison's
claim arises, instead, out of his allegation that he was
improperly reclassified on the basis of the nature of his
underlying criminal conviction, and an incorrect statement that
he had failed to participate in certain voluntary programming.

---

[8]Ellison names Head of Classifications Rick Manseau as an
intended defendant to this claim.  Ellison has not alleged any
facts here to indicate that Manseau was either directly or
indirectly responsible for endangering or failing to protect
Ellison.  Accordingly, I recommend that he be dismissed from this
action.  Further, while Ellison names defendants Pelletier,
Lirette, Boyajian and Hogan as Hancock building officers, he has
not alleged any specific facts indicating how they are
responsible for failing to protect him.  I therefore recommend
that they, too, be dismissed from this action.

13

Ellison claims a further deprivation of due process when he was transferred from Hancock to the more restrictive SHU without receiving a written notice that his classification status had been changed.

An inmate has no liberty interest in being housed or classified in a particular facility or in a particular security status.  Meachum v. Fano, 427 U.S. 215, 225 (1976); Montanye v. Haymes, 427 U.S. 236, 242 (1976) (discussing that the holding in Meachum dictates that "[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight.").  "[A]n increase in burdensome conditions does not in itself implicate the due process clause."  Sisbarro v. Warden, Mass. State Penitentiary, 592 F.2d 1, 3 (1st Cir. 1979) (citing Meachum, 427 U.S. at 224–25).  As prison inmates do not have any liberty interest in where they are housed, transfers within the prison are well within the discretion of prison officials, and inmates are not protected from such transfers by the constitution.  See Olim v. Wakinekona, 461 U.S. 238, 244–45

(1983) (citing <u>Meachum</u>, 427 U.S. at 224-25, to support the
conclusion that prisoners have no liberty interest protecting
them from housing transfers).  Accordingly, I recommend that
Ellison's claims based on his disagreement with decisions of the
defendants regarding his classification and housing assignment be
dismissed as they fail to allege a liberty interest protected by
the constitution upon which relief might be granted.

  B. <u>Administrative Code Violations</u>

  Ellison argues that his due process rights were violated by
the defendants' failure to follow the New Hampshire Code of
Administrative Regulations by not immediately notifying him in
writing of his PAR status.  An inmate is placed on PAR status,
which is a temporary suspension of his classification status, to
allow prison officials to investigate certain issues, including
an inmate's involvement in an altercation or other incident that
implicates his safety, or that of another individual in the
institution.  <u>See</u> N.H. Admin Code Cor. ("COR") 404.04(c).  The
administrative code instructs DOC staff to prepare a PAR slip and
file it on the day the staff member places the inmate on PAR
status, and that an inmate should promptly receive a copy of the
slip, and be advised of his right to appeal his placement on that

status to the Warden within 48 hours.  COR 404.04(d).  In

addition, the administrative code directs that a classification

hearing is to be held within seven days of an inmate's placement

on PAR status, and every seven days thereafter if the inmate

remains in PAR status.  COR 404.04(f), (h) & (I).

In <u>Sandin v. Conner</u>, the United States Supreme Court held

that where, as here, an alleged due process violation is based on

a failure to follow a state regulation ostensibly creating a

liberty interest, the Court, instead of focusing on the language

of the regulation to determine whether a liberty interest was

created, should look to the deprivation to determine whether or

not it resulted in "the type of atypical, significant deprivation

. . . in which a State might conceivably create a liberty

interest."  515 U.S. 472, 486 (1995).  The regulations that

Ellison claims were violated governed the notice and appellate

rights afforded to those inmates placed on PAR status.  Even

assuming that the regulations were violated, however, they

resulted in Ellison spending a total of 12 days in the SHU

without knowing why he was there.  Twelve days in a higher

security classification, without more, is not a restraint that is

so significant or atypical that it deprives Ellison of his

constitutional due process rights.  See Skinner v. Cunningham, 430 F.3d 483, 486-87 (1st Cir. 2005) (finding that confinement in segregation for forty days with no pre-segregation process was not a hardship sufficient to give rise to a due process violation where inmate was being investigated for killing another inmate, possibly in self defense, and where prison officials determined that isolation was necessary to protect both the segregated inmate and other people in the institution); see also Jordan v. Fed. Bureau of Prisons, 191 Fed.Appx. 639, 650-51 n.8-10 (10th Cir. 2006) (recognizing a split in the Circuit Courts regarding how to define hardship in making a determination of constitutionality under Sandin, and collecting cases indicating that time in segregation in the amounts of ninety days to more than two years did not establish atypical and significant hardship sufficient to create a cognizable liberty interest if conditions of confinement were not dramatically different from those in general population).  Ellison points to no condition present in his twelve days of segregated confinement that indicates a dramatic departure from the conditions of confinement to which he could have been subjected outside of the unit to

17

raise a liberty interest cognizable in a § 1983 action.

Accordingly, I recommend that this claim be dismissed.

IV.   Unprofessional and Disrespectful Treatment

Ellison alleges that the defendants, on a number of occasions, behaved unprofessionally and treated him with disrespect.  Ellison alleges that this treatment violated the defendants' obligation to treat him with dignity and respect under the guidelines for corrections workers adopted by the American Correctional Association and the internal Policy and Procedure Directives ("PPDs") maintained by the DOC.  The violation of these behavioral guidelines, however, do not give rise to a private cause of action in this Court because disrespectful treatment, however, unprofessional, is not prohibited by the constitution.  See Shabazz v. Cole, 69 F. Supp. 2d 177, 201 (D. Mass. 1999) (holding that verbal threats and verbal abuse, while unprofessional and indefensible, do not, in the prison context, violate an inmate's constitutional rights and therefore, no § 1983 action will lie for such behavior).

V.   Disciplinary Finding and Sanction

Ellison claims that he was found guilty of a disciplinary infraction and sanctioned with a restitution order for half of

his medical bills because the defendants were trying to cover up their own failure to protect him from being attacked.  To the extent that he challenges the disciplinary process, however, his claim arises under the Due Process Clause of the Fourteenth Amendment.  Once again, Ellison fails to allege that the sanction imposed, restitution, constitutes an atypical and significant hardship in the context of prison life.  The fact that the prison wants reimbursement for medical services does not restrain Ellison's liberty in any fashion, much less to a degree that renders it excessive, as is required to state a due process violation under Sandin.  See Sandin, 515 U.S. at 486. Accordingly, I recommend that this claim be dismissed.

VI.   Forced Programming

Ellison alleges that his rights have been violated because the DOC requires inmates to participate in and complete certain rehabilitative programming prior to being granted parole. Ellison argues that rehabilitative programming is supposed to be voluntary, and that requiring inmates to complete programming in order to be considered for release on parole is actually forcing programming on inmates.  Ellison's argument depends on his presumption that inmates have a right to be paroled if he is

19

simply of good behavior, even without engaging in any affirmative act toward achieving rehabilitation.  Under both federal and state law, inmates have no protected liberty interest in being granted parole at all.  See Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, 7 (1979); Brooker v. Warden, No. 98-466-JD, 1999 WL 813893, at * 2 (D.N.H. June 22, 1999).  Because Ellison has no protectible liberty interest in being granted parole, he can allege no constitutional violation against prison officials who condition the release on parole upon the inmate meeting some benchmark of rehabilitation.  Accordingly, I recommend that this claim be dismissed from this action.

VII. Equal Protection

Ellison asserts that defendants violated his Fourteenth Amendment right to the equal protection of the laws when they denied him services discriminatorily because he is a convicted sex offender.  The Equal Protection Clause requires states to treat similarly situated persons alike.  Plyler v. Doe, 457 U.S. 202, 216 (1982); Toledo v. Sanchez, 454 F.3d 24, 33 (1st Cir. 2006), cert. denied, Univ. of P.R. v. Toledo, ___ U.S. ___, 127 S. Ct. 1826 (2007).  Ellison has proffered no facts which would indicate that his status as a sex offender either warrants

membership in a protected class of persons, or that he was
treated differently than other similarly situated persons.
Therefore, I find that Ellison has not alleged any facts that
state a claim for an Equal Protection Clause violation, and I
recommend that the claim be dismissed from this action.

VIII. <u>Defamation</u>

Ellison attempts to allege a state law claim for defamation
based on the notation on his classification sheet that he is a
"sexual predator."  Under New Hampshire law, "to establish
defamation, there must be evidence that a defendant published a
false and defamatory statement of fact about the plaintiff to a
third party."  <u>Moss v. Camp Pemigewassett, Inc.</u>, 312 F.3d 503,
507 (1st Cir. 2002) (quoting <u>Indep. Mech. Contractors, Inc. v.</u>
<u>Gordon T. Burke & Sons, Inc.</u>, 138 N.H. 110, 118, 635 A.2d 481,
492 (1983)) (other internal citations omitted).  "A statement is
defamatory if it 'tends to lower the plaintiff in the esteem of
any substantial and respectable group of people.'"  <u>Moss</u>, 312
F.3d at 507 (citing <u>Nash v. Keene Publ'g Corp.</u>, 127 N.H. 214,
219, 498 A.2d 348, 351 (1985)).  Ellison's complaint does not
allege that this comment was published to any third party by the
NHSP defendants.  It appears that this was an internal document,

of which a copy was provided to plaintiff, that was used only for classification purposes.  Further, to the extent that Ellison claims that he is not a "sexual predator," and that such a label is therefore false for purposes of classification decisions, he cites no authority, and I know of none, that supports the notion that classification decisions cannot, or should not, be made based, at least in part, on the nature of an inmate's incarcerating offense.  As I can find no support for Ellison's allegation that he was defamed, even generously construing Ellison's claim, I recommend that it be dismissed.

IX.   Choice of Defendants

    A.   Official Capacity

Section § 1983 authorizes suits against state actors operating to deprive citizens of their constitutional rights.  I have found that Ellison has alleged a constitutional failure to protect claim against a number of state defendants sufficient to state a cause of action under § 1983.  Those individuals will be defendants to this suit in their individual capacities.

Ellison also sued the defendants in their official capacities.  It is well-settled that the Eleventh Amendment bars suits against state entities and state agents working in their

official capacities unless the state has expressly waived
immunity, which has not been done by New Hampshire for actions
brought under § 1983.  See P.R. Aqueduct & Sewer Auth. v. Metcalf
& Eddy, Inc., 506 U.S. 139, 144 (1993) (absent waiver, neither a
State nor agencies acting under its control may be subject to
suit in federal court); Will v. Mich. Dep't of State Police, 491
U.S. 58, 71 (1989) (holding that neither a state nor its
officials acting in their official capacities are "persons" under
§ 1983).  Official capacity suits against officers of an agency
are simply "another way of pleading an action against an entity
of which an officer is an agent."  Monell v. Dep't of Soc.
Servs., 436 U.S. 658, 690 n.55 (1978).  Accordingly, I recommend
dismissal of all of the official capacity claims against the
defendants to this action.  I also recommend that the DOC, as a
state agency, be dismissed from this action.

     B.   Supervisory Liability

     "Supervisory liability under § 1983 cannot be predicated on
a respondeat [superior] theory, but only on the basis of the
supervisor's own acts or omissions."  Aponte Matos v. Toledo
Davila, 135 F.3d 182, 192 (1st Cir. 1998) (internal citations
omitted).  A supervisor, to be liable for the acts of those who

serve underneath him, must have been either "a primary actor involved in, or a prime mover behind, the underlying violation." Camilo-Robles v. Zapata, 175 F.3d 41, 43-44 (1st Cir. 1999). There must be "an affirmative link, whether through direct participation or through conduct that amounts to condonation or tacit authorization" of the violation alleged.  Id. at 44.

Ellison has named Marquis, Whittan, Cunningham, Cattell, Crompton, and Wrenn as defendants to his endangerment and failure to protect claim in their supervisory capacities.  Ellison bases his allegation of supervisory liability on the fact that the supervisors created and supported a policy of inadequate staffing in the Hancock building, knowing that the building, and in particular C-pod, were particularly dangerous places for a sexual offender to be housed.  The policies underlying the provision of security in the Hancock building were made or continued after the prison had been sued by another inmate alleging the same dangerous environment on C-pod of which Ellison complains here. Because he has alleged not only that they knew of and disregarded a serious risk to his safety, but that their policies were unresponsive to the known security needs of sexual offenders and were even designed to allow the targeting and victimization of

24

sexual offenders, Ellison has alleged sufficient facts to state a claim against Marquis, Whittan, Cunningham, Cattell, Crompton, and Wrenn in their supervisory capacities.

Conclusion

In my Simultaneous Order, I direct that the endangerment and failure to protect claims be served on defendants Biledeau, McGrath, Marquis, Whittan, Cunningham, Cattell, Crompton, and Wrenn.  For the reasons explained above, I recommend dismissal of the remaining claims and defendants from this action.

Any objections to this report and recommendation must be filed within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the district court's order.  See Unauthorized Practice of Law Comm. v. Gordon, 979 F.2d 11, 13–14 (1st Cir. 1992); United States v. Valencia–Copete, 792 F.2d 4, 6 (1st Cir. 1986).

James R. Muirhead
United States Magistrate Judge

Date:     October 9, 2007

cc:       Tony L. Ellison, pro se